## CARTER *v.* THOMPSON.

Opinion delivered January 19, 1925.

1. VENDOR AND PURCHASER—VENDOR'S LIEN—EVIDENCE.—In a suit upon a note given in consideration of a conveyance of land, the preponderance of the evidence *held* to show that the deed, which was lost, contained a reservation of a vendor's lien.

2. MORTGAGES—NOTICE OF RESERVATION OF VENDOR'S LIEN.—A vendor's lien expressly reserved in a deed will be enforced against the purchaser's mortgagee, though such deed is not on record, if the mortgagee claims through such deed.

3. MORTGAGES—PRIORITY OF VENDOR'S LIEN.—Where an heir conveyed his interest in land reserving a vendor's lien, such lien will not be subordinated to the lien of mortgagees of his vendee who relied upon recitals in deeds of other heirs that they were the only heirs and upon an *ex parte* affidavit to the same effect.

4. VENDOR AND PURCHASER—ENFORCEMENT OF VENDOR'S LIEN.—A vendor conveying his interest in lands with reservation of a vendor's lien for the balance of the purchase money could not be deprived of his right to enforce such lien against his purchaser's mortgagee by the failure of the purchaser to disclose the vendor's rights under the vendor's deed which was not recorded.

Appeal from Clark Chancery Court; *C. E. Johnson,* Chancellor; reversed.

*Culbert L. Pearce, John E. Miller* and *J. H. & D. H. Crawford,* for appellant.

The deed contains sufficient and proper recitals to create a vendor's lien in favor of appellant, and this lien is not subordinate and inferior to the mortgage liens. 27 R. C. L. 605, 606, 608; 23 L. R. A. 743; 29 Ark. 650; 37 Ark. 571; 43 Ark. 464; 50 Ark. 322; 21 U. S. (Law ed.) 587; 35 Ark. 103; 103 Ark. 429; 23 L. R. A. (N. S.) 1180; 118 Ark. 199; 152 Ark. 99; 27 R. C. L. 668.

*J. O. Rhyne,* for appellee.

The appellees were innocent purchasers and should be protected. 95 Ark. 582; 118 Ark. 516; 122 Ark. 445; 132 Ark. 158; 49 Ark. 207, 214; 1 Jones on Mortgages, §§ 458, 459, 710; 4 Ark. 296; 57 Ark. 427; 1 Perry on Trusts, § 239. The deed under which appellant claims was not recorded and did not retain a vendor's lien, as appears by Thompson's testimony and the copy of the

deed introduced in evidence. The chancellor's finding on the facts ought not to be disturbed unless contrary to the clear preponderance of the evidence. 121 Ark. 309; 84 Ark. 429; 91 Ark. 149. Where the defense of innocent purchaser is involved, and the party pleading it has shown that he has paid a valuable consideration, the burden rests on the other party to show that he purchased with notice. 145 Ark. 121; 108 Ark. 490; 123 Ark. 432; 84 Ark. 1; 27 R. C. L. 718; 137 Ark. 538.

WOOD, J. On the 28th of April, 1923, Douglas Carter instituted this action against Obe S. Thompson and his wife, Eula Thompson, to which action the Security Mortgage Company and the McIver Abstract Company were also made defendants. Carter alleged that on the 18th day of May, 1918, he was the owner of an undivided two-sevenths interest in 188 acres of land in Clark County, which he sold to Obe S. Thompson and Eula Thompson, his wife, on that date, for the consideration of $750, $50 of which was paid and $700 evidenced by a promissory note, payable December 1, 1918. Carter alleged that the note was secured by a vendor's lien which was reserved in the deed to Thompson and wife; that, for reasons unknown to plaintiff, the defendants, Thompson and wife, withheld the deed from record. The plaintiff alleged that the mortgage company and the abstract company and others were claiming liens on the property, and he asked that they be required to answer and set up the nature and the extent of their claims and liens, if any, and he prayed that he have judgment against Thompson for $987.47, with interest, and that the same be declared an equitable lien upon the lands mentioned, superior to the rights of any of the defendants, and, unless the debt of Thompson was paid, that the lands be sold to satisfy the same.

The mortgage and abstract companies answered jointly, setting up their respective mortgages, and denied the allegations of the complaint. They set up that they were claiming an interest in the property under valid

and subsisting mortgages executed to them by Thompson and wife; that the mortgage to the mortgage company was executed April 5, 1919, to secure a promissory note for the aggregate sum of $4,000, due April 1, 1919, which mortgage was duly recorded on April 19, 1919, that the mortgage to the abstract company was executed to secure notes in the aggregate sum of $1,117.78, due from April 1, 1920, to April 1, 1926; that the mortgage to the abstract company was subject to the mortgage to the mortgage company; that, by reason of the mortgages to them and the advances made by them to Thompson and wife, they were the purchasers and owners of the property, having acquired the same without notice, actual or constructive, of the interests of the plaintiff Carter. They set up that they had become owners in fee simple of the lands, and had held continuous, adverse and hostile possession for seven years, and pleaded the statute of limitations in bar of plaintiff's claim.

The plaintiff testified substantially to the effect that he inherited a one-seventh interest in the lands in controversy from his mother, Melissa E. Carter, who, at her death, left seven living children. Plaintiff bought the interest of one of his sisters, and therefore he owned a two-sevenths interest in the lands. He sold this two-sevenths interest on March 18, 1918, to Obe S. Thompson, who married witness' sister, Eula Carter. The consideration was $750, $50 being paid in cash and the balance of $700 evidenced by a promissory note payable December 1. The note contained the recital that "this note is based upon a land deed of even date. This note is given for a 2/7 undivided interest in land containing 188 acres, all in sections 19 and 20, township 7, range 20." The note was signed by Obe S. Thompson. The witness did not execute the deed on the day the note was executed, but the next week he sent Thompson a deed by mail. Witness executed to Thompson a warranty deed, which showed on its face that lien was retained for the

balance due on the purchase money. Thompson had never paid the note. On cross-examination, a paper was handed to witness, and he was asked if that was a copy of the deed, and he answered that it was, except that the deed witness signed did not have the words "for which a vendor's lien is retained" scratched out. The paper, thus identified, was introduced, and it recited, in part, as follows: "That D. Carter and wife, Allie M. Carter, for and in consideration of the sum of $50 to us in hand paid by Obe Thompson, the receipt of which is hereby acknowledged, and the further sum of $700, to be paid as follows, for which vendor's lien is retained: seven hundred dollars, December 1, 1918, at 8 per cent. interest per annum from date, do hereby grant, bargain, sell and convey unto the said Obe Thompson and unto his heirs and assigns forever the following lands, lying in the county of Clark and State of Arkansas, to wit." Then follow the *habendum* and warranty clauses, with the relinquishment of dower. There was a line drawn with red ink through the words "for which a vendor's lien is retained." The deed was dated March 18, 1918, and acknowledged on April 6, 1918. Witness testified that the words through which the line was run were not stricken out when the deed was delivered to Thompson through the mail, and at the same time he also delivered to Thompson the deed that had been executed to witness by witness' sister to her 1/7 interest.

It was shown by several witnesses, and it is undisputed, that the plaintiff was one of seven children of George W. and Melissa E. Carter. Thompson testified that he executed the note above mentioned to the plaintiff Carter for the 2/7 interest he claimed in the lands. Carter executed a deed to witness for this interest. The deed was misplaced. Carter also delivered to witness a deed from his sister to him for her 1/7 interest. The 2/7 interest conveyed to witness by Carter is covered by a mortgage which the witness gave the mortgage company and the abstract company, and this is the same land

mentioned in the note witness executed to Carter for the land. Witness had paid nothing on this note.

J. O. Rhyne testified that he was the attorney for the mortgage company and the abstract company, and had in his hands a deed sent him by Obe S. Thompson in May or June, 1923. After looking over the deed and making a copy thereof, he mailed it back to Thompson. Witness had not had in his possession the deed from Lola Bridges to the plaintiff, dated March 15, 1913. The first time witness learned of the existence of the deed from Carter and wife to Thompson was when he read a copy of the complaint. The deed referred to was received by witness one day and mailed back to Thompson the next.

The testimony of the president of the mortgage and abstract companies was to the effect that he didn't know of any outstanding claims of the plaintiff against this property at the time the loans were made to Thompson. If he had, he would not have closed same. He first learned of it on April 27, 1923. Thompson submitted an abstract of title to the companies in order to obtain the loan. The abstract was turned over to the title examiner of the companies. The examiner testified that the common source of title to the lands in controversy was in Melissa E. Carter, who died about the year 1893; that Obe S. Thompson claimed title under deeds executed by John H. Carter and wife, W. A. Garmaney and wife, George Wilson and wife, dated May 20, 1916, and which recited that the grantors were the only heirs at law of Melissa E. Carter, deceased, except Eula E. Thompson, wife of the grantee; that there was a second deed, dated May 29, 1916, from the same grantors to Obe S. Thompson, containing the same recital as to the grantors being the only heirs at law of Melissa E. Carter, deceased. The examiner of the abstract asked that an affidavit be produced, showing when Mrs. Carter died, the names and ages of her children. An affidavit was made by one John L. Bozeman, who stated that he was 67 years of age,

and had known the Carter family for many years. He knew Melissa E. Carter in her lifetime. She died at the home of her husband, on June 24, 1893. Eula Carter Thompson, Emma Carter Garmaney, Georgia Carter Wilson, John H. Carter, and Will Carter were the only heirs at law of Melissa E. Carter, deceased. Upon the affidavit of Bozeman, after rechecking the title and basing his opinion on the abstract brought down to date, including the affidavit of Bozeman, the examiner approved the title. The abstract showed the mortgage from Thompson and wife to the mortgage company, and the companies thereupon advanced to Thompson the money secured by the mortgages.

On cross-examination the examiner of title stated that the abstract did not show any conveyances from Carter and Lola Bridges to Obe S. Thompson. The first witness heard of Carter's claim was when Rhyne showed witness a copy of the complaint in this case. Witness did not see the deed from Douglas Carter to Obe Thompson, but saw a copy of what purported to be a copy of that deed in the hands of the companies' lawyer. He did not recall reading any portion of it. Witness saw it about two or three weeks before testifying, when Rhyne came to witness' office to see him about testifying in the case.

McIver, the president of the mortgage and abstract companies, being recalled, testified that he did not know that Thompson had sent the original deed to his attorney, Rhyne, after the suit was instituted. Witness never at any time or place saw a purported copy of the deed.

Thompson, being recalled by the companies, stated that he had a conversation with McIver, the president of the companies, in April, and told him that there was no vendor's lien on the land in favor of Carter; that the note he gave said nothing about a lien, and that if there was a lien shown, it was a forgery. Witness and his wife executed the mortgages to the companies in 1919, and intended it to be a first and second lien on the property.

Upon the pleadings and the testimony, the court found that the mortgages given by Thompson and wife to the mortgage and abstract companies, dated April 5, 1919, and upon the entire interest in the lands in controversy, were superior and paramount to the equitable vendor's lien held against an undivided 2/7 interest therein by the plaintiff by reason of the balance due him on the purchase money for said interest; that the rights of the plaintiff were superior in equity to all the rights and claims of all the defendants, except the mortgage and abstract companies, and that plaintiff was entitled to a judgment in the sum of $1,005.66, with interest, for the balance due him for an undivided 2/7 interest in the lands in controversy, subject to the rights of the mortgage and abstract companies; and ordered the lands sold to satisfy the judgment of the plaintiff, and entered a decree in accordance with such findings. The plaintiff appeals from that part of the court's decree subordinating his lien on his 2/7 interest in the lands in controversy to the liens of the mortgage and abstract companies.

1. The appellant testified unequivocally that the deed of himself and wife to Obe Thompson to the lands in controversy, dated March 18, 1918, at the time the same was delivered to Obe Thompson, had in it the words, "vendor's lien is retained." These words were not stricken out at that time, and, if they were stricken out thereafter, it was without any authority from the appellant.

Thompson testified that he did not have the deed that was delivered to him by the appellant; that the deed had been lost or misplaced. He could not find it; he could not say where he last saw it; he did not remember whether he sent it to the McIver Abstract Company or to its attorney. The attorney for the abstract company testified that he had in his possession a deed from Carter and wife to Thompson, dated March 18, 1918, which conveyed the lands in controversy; that the deed was sent

to him in May or June, 1923, by Thompson, after the institution of this action, and witness made a copy of it, but witness did not testify that the words, "vendor's lien is retained," were erased by having a red line run through them at the time he made a copy of the deed. He did not remember the exact description, nor whether it was signed by Carter and wife, or just by Douglas Carter. After looking it over he mailed it back to Thompson the same day or the next after receiving it. Thompson testified that he agreed to give the appellant a plain note, without any lien whatever against the land, and none was to be in the deed; that the note he gave said nothing about a lien, and that, if there was a lien shown in the note, it was a forgery.

The note was introduced, dated March 18, 1918, for $700, with the recital that the note was based upon a land deed of even date and given for two-sevenths of an undivided interest in land containing 188 acres, the land in controversy. Thompson testified that the note bore his signature.

It will thus be seen that the testimony of the appellant is consistent, while the testimony of Thompson as to the note is contradictory, and, as to the loss of the original deed executed by appellant to him, is unsatisfactory. The deed itself, if produced, would have been an absolute demonstration of the truth or falsity of appellant's testimony to the effect that this deed contained the words "vendor's lien is retained," when the same was delivered by him to Thompson. We are convinced that the testimony of the appellant concerning this is true, and that a decided preponderance of the evidence shows that, in the deed of the appellant to Thompson conveying the lands in controversy, there was an express reservation of a vendor's lien. Such being the fact, the appellees were bound to take notice of appellant's vendor's lien, because it was in their chain of title. The appellees claimed title to the lands in controversy through Thompson, and Thompson's title was derived

through the appellant. If Thompson, at the time he executed the mortgages through which the appellees claimed, had no title, then appellees acquired none. Thompson, at the time he executed the mortgages to the appellees, April 5, 1919, had acquired no title by adverse possession as against the appellant, for, within less than a year before that, he had recognized appellant's title by accepting the deed with the vendor's lien reserved for the balance of the purchase money evidenced by his note. The appellees were not innocent purchasers, because the law is well settled that a vendor's lien "will be enforced against all persons having either actual or constructive notice of its reservation, and a subsequent purchaser or incumbrancer necessarily takes subject to a lien for the purchase money expressly reserved in the deed conveying the legal title to his grantor or remote grantor, as he is bound to take notice of the provisions and reservations in his immediate grantor's chain of title; and it is immaterial that the deed reserving the lien is not recorded if the persons against whom the lien is sought to be enforced must claim through such deed." 27 R. C. L. p. 608, § 361.

In *Stephens* v. *Shannon,* 43 Ark. 464-467, we said: "A vendor of land, who has parted with the legal title, has, nevertheless, in equity, a lien for the purchase money as against the vendee and his privies, including subsequent purchasers with notice. The deed of Shannon, which contains the reservation of the lien, was not placed on record. But Stephens was affected with notice of all recitals in the title deeds of his vendor, whether they were of record or not." See also *Stidham* v. *Matthews,* 29 Ark. 650; *Stroud* v. *Pace,* 35 Ark. 103; *Gaines* v. *Summers,* 50 Ark. 322; *Abbott* v. *Parker,* 103 Ark. 429; *Graysonia-Nashville Lbr. Co.* v. *Saline Development Co.,* 118 Ark. 199.

2. Notwithstanding this doctrine, learned counsel for the appellees contends that they are innocent purchasers because, in preceding conveyances to Thompson,

certain grantors had stated that they were the sole heirs of the record owner of the land, and the examiner of the abstract of title, before he approved the title upon which the appellees relied, required an affidavit to be furnished showing who were the sole surviving heirs of the record owner. But the undisputed evidence shows that the appellant was an heir of the record owner of the title, and had acquired through inheritance a one-seventh interest and through purchase from his sister another one-seventh interest, and that he was the real owner of a two-sevenths interest of the lands in controversy, at the time he conveyed the same to Obe Thompson and reserved the vendor's lien, and that he had such lien at the time Thompson executed the deed of trust to the appellees under which they claimed. Therefore the contention of counsel for appellees cannot be sustained, for the reason that the appellant, as the real owner of the land in controversy, could not be deprived thereof by recitals in deeds of other heirs and owners that they were the only heirs, backed up by an *ex parte* affidavit to that effect. The *ex parte* affidavit and the recitals in the deeds of other joint owners to the effect that they were the only owners were wholly incompetent to prove that the appellant was not an heir of George W. and Melissa E. Carter, the original owners of these lands, and that certain others, whose deeds Thompson held, were the only heirs. A vendor, as against those holding joint and equal rights, can convey only such rights as he in fact has, and his vendee takes subject to the right and title of such other persons. Thompson, as the vendor or mortgagor, could convey to the appellees only such title as he had. The appellees, as mortgagees, had no greater rights than vendees. And the vendor, as against third persons having a joint and equal right, can convey only such right and title as he has, and the purchaser takes subject to such rights of other persons.

As is well said in 27 R. C. L., p. 668 § 431, "he who has no title can convey none, and a bad title is not made

good by the ignorance of the purchaser of its defects, or his want of knowledge of the better title.'' The appellant, being the owner of the land in controversy, and having conveyed the same to Thompson, with a reservation of his vendor's lien, cannot be deprived of the benefits of such lien through the failure of Thompson, by recitals in his mortgage or otherwise, to disclose appellant's rights. If Thompson had forged deeds from the other heirs of Melissa E. Carter to himself, containing the recitals that they were the only heirs, and had placed these deeds of record, this would not have affected the rights of appellant as a co-heir of Melissa E. Carter. It would be an anomalous and dangerous doctrine to hold that one who sold his land, expressly reserving a vendor's lien, could be deprived of his rights to such lien by any such fraudulent conduct on the part of his vendee or any third party. Titles and rights in lands cannot be vested and divested in any such manner. See 27 R. C. L. p. 674, § 438, 439, and cases cited in note.

It follows that the trial court erred in holding that the mortgages of the appellees were superior and paramount to the right of the appellant under his vendor's lien. For this error the judgment is reversed, and the cause is remanded with directions to enter a decree declaring the appellant's rights in the lands in controversy under his vendor's lien superior to the rights of the appellees, and for such other and further proceedings as may be necessary according to law and not inconsistent with this opinion.

### DISSENTING OPINION.

McCulloch, C. J. The undisputed evidence is that the ancestor of appellant and of appellee Thompson died about twenty-six years before the execution of the mortgage to appellee, Security Mortgage Company; that Thompson was in exclusive possession of the property, claiming title by inheritance as to an undivided interest, and from the other heirs under recorded deeds, and that the mortgage company made inquiry concerning the num-

ber and identity of the heirs of the ancestor, and received evidence in the form of an affidavit that Thompson and his grantors in the recorded deeds were the only heirs. The chancery court found that the inquiry made by the mortgage company was sufficient, and that the company was an innocent purchaser for value.

All of the authorities mention, as the elements of a *bona fide* purchase of land, "a valuable consideration, the absence of notice, and the presence of good faith." This is the definition adopted by this court in *Manchester v. Goeswich*, 95 Ark. 582. Notice which will defeat the claim of innocent purchase may be either actual or constructive. It must be conceded that in the present case the mortgage company had no actual notice of appellant's adverse claim, for there is no evidence of any information conveyed to the mortgage company on that subject or any information which would lead to a discovery of appellant's claim. But the opinion of the majority holds, as I understand it, that the inheritance of the land from a common ancestor who was the holder of the record title constituted constructive notice of the number and identity of the heirs who inherited. That is the point of my disagreement with the majority. I concede that the devolution of the estate from the ancestor who held the record title constituted constructive notice to all subsequent purchasers from the heirs, but the matter of the identity of the heirs is not one of constructive notice, and rests upon evidence *aliunde* and depends upon actual notice, or notice of such facts as would put a purchaser upon inquiry. The identity of the heirs is a matter *in pais,* and necessarily depends upon actual knowledge, therefore there is no constructive notice of such identity.

Professor Pomeroy in his work on Equity Jurisprudence (4th ed., vol. 2, § 607) says:

"It may be stated as a general proposition that, in all instances of constructive notice belonging to this class, where it arises from information of some extraneous facts, not of themselves tending to show an actual

notice of the conflicting right, but sufficient to put a prudent man upon an inquiry, the constructive notice is not absolute; the legal presumption arising under the circumstances is only *prima facie;* it may be overcome by evidence, and the resulting notice may thereby be destroyed. Whenever, therefore, a party has merely received information, or has knowledge of such facts sufficient to put him on an inquiry, and this constitutes the sole foundation for inferring a constructive notice, he is allowed to rebut the *prima facie* presumption thence arising by evidence; and, if he shows by convincing evidence that he did make the inquiry, and did prosecute it with all the care and diligence required of a reasonably prudent man, and that he failed to discover the existence of, or to obtain. knowledge of, any conflicting claim, interest, or right, then the presumption of knowledge which had arisen against him will be completely overcome; the information of facts and circumstances which he had received will not amount to a constructive notice. What will amount to a due inquiry must largely depend upon the circumstances of each case.''

We have here a typical case of the application of the doctrine. The mortgage company was dealing with one who was in actual occupancy of the land in controversy under record title, and there was nothing to constitute notice of an adverse claim. The ancestor had been dead twenty-six years, and, to protect itself, the mortgage company made inquiry as to the number of heirs. There is an element of estoppel involved in the application of the doctrine, and of this Professor Pomeroy (in § 735) says:

''When the original legal owner has done or omitted something by which it was made possible that his property should come into the hands of a *bona fide* holder by an apparently valid title, it may be just to regard him as estopped from asserting his ownership, and thus to protect the subsequent purchaser. But, when the prior legal owner is wholly innocent, has done and omitted nothing, it certainly transcends, even if it does not violate, the

principles of equity to sustain the claims of a subsequent and even *bona fide* purchaser."

Appellant, by yielding possession to his cotenant, Thompson, clothed the latter with the highest evidence of ownership, and he thus made it possible for a subsequent purchaser to be deceived. He could have retained possession as evidence of his ownership, or he could have preserved his security in the form of a mortgage so that it could be put upon record as constructive notice. He did neither, and as he was, to that extent, in the wrong, he should be the sufferer instead of the subsequent purchaser, who was innocent of any notice of his claim.

The majority base their conclusions upon a statement from the textbook that "a bad title is not made good by the ignorance of the purchaser of its defects or his want of knowledge of a better title." This is far from being a correct statement of the law, as is evidenced by many decisions of this court. See Crawford's Digest, subject, "Vendor and Purchaser," vol. 4, § 81 *et seq.* See especially *Case* v. *Caddo River Lumber Co.,* 126 Ark. 240, where the opinion was written by the justice who now speaks for the majority. A bad title has, in fact, been often made good under certain circumstances by the ignorance of a subsequent purchaser. The books are full of cases where this rule has been recognized, for, if the statement of the law quoted by the majority is correct, then the doctrine of innocent purchaser is completely obliterated.

In *Stubbs* v. *Pyle,* 137 Ark. 538, we said: "Pyle had possession and the record title at the time he mortgaged the property to Brun, and at the time he subsequently executed the deed to Durham, and the parties who dealt with him had the right, in the absence of notice to the contrary, to assume that he was the owner. They were not bound to make inquiry concerning the prior possession of Jones under his unrecorded contract. The parties so dealing with Pyle had the right to treat this possession as referable to his record title."

I am unable to perceive why the identity of an heir of a deceased former owner of land should constitute absolute constructive notice any more than any other fact *in pais.* It is a fact which may or may not rest upon doubtful evidence, and if a purchaser, in accepting a conveyance from one in actual possession of land, makes such inquiry as a reasonably prudent person would make under the circumstances, then he is entitled to protection as an innocent purchaser. The extent of the inquiry, of course, depends upon the facts of a given case. Where the descent has been recently cast, the fact may be deemed so plain that there is no ground upon which a claim of innocent purchase can be rested; but where, as in this case, the ancestor has been dead a great length of time, and the heirs are scattered and their identity uncertain, I see no reason why the purchaser should not be protected, as well as from any other secret adverse claim. I do not contend that the real owner of land could "be deprived thereof by recitals in deeds of other heirs and owners that they were the only heirs," nor that a vendor could be deprived of his right to a lien merely on account of the fact that his deed of conveyance is unrecorded. I do contend, however, that, where one has no record title and for a long lapse of time permits his property to be held under circumstances which completely obscure his interest, one who buys for a valuable consideration and without knowledge of his claim should be protected as an innocent purchaser.